## THE ATTORNEY-GENERAL *against* THE UTICA IN-SURANCE COMPANY.

This Court has no jurisdiction over offences against a public statute, or to restrain persons from carrying on the business of *banking*, in violation of the act passed the 6th of April, 1813, to restrain unincorporated banking associations ; and a motion made by the *attorney-general*, on an information filed by him, *ex officio*, for an injunction for that purpose, was refused.

January 27th
and 29th.

THIS was an information filed by the attorney-general, *ex officio*. It stated that by an act of the legislature, passed the 6th of *April*, 1813, entitled, " *an act to prevent the passing, and receiving of bank notes less than the nominal value of one dollar, and to restrain unincorporated banking associations,*" it was, among other things, enacted, that *no person*, unauthorized by law, should subscribe to, or become a member of, any association, institution, or company, or proprietor of any bank or fund, for the purpose of issuing notes, receiving deposits, making discounts, or transacting any other business which incorporated banks may do or transact, by virtue of their respective acts of incorporation ; and that if any person, unauthorized by law, as aforesaid, should thereafter subscribe, or become a member, or proprietor, as aforesaid, he should _forfeit_ and pay for every such offence, the sum of 1,000 dollars, to be recovered by any person who

should sue for the same, in any action of *debt, one half thereof to his own use, and the other half to the use of the people; and that all notes and securities for the payment of money, or the delivery of property, made or given to any such association, institution, or company, not authorized as aforesaid, should be null and void :† that the said act is now in full force: that on the 29th of *February*, 1816, *Bryan Johnson* and others, his associates, of the village of *Utica*, produced to the legislature, evidence of having published in a newspaper in the said village, and in the state paper, for ᴎix weeks, a *notice* of an intended application to the legislature, to incorporate an *insurance company* in the village of *Utica*, with a capital not to exceed 500,000 dollars; and that on the same day, they presented to the legislature a petition, stating, that an association had been formed to establish an *insurance company* in the village of *Utica*, for mutual safety, and that of the community, against fire, and the hazard of navigation, on the lakes and inland waters: that an act passed the 29th of *March*, 1816, entitled "*an act to incorporate the Utica Insurance Company*," by which, &c. That the object of the act was, as stated in the preamble to it, &c., and that the legislature did not intend to establish a banking institution, or to authorize the said *Utica Insurance Company* to engage in banking operations of any kind: that in the petition they did not request of the legislature that they might be invested with the powers of banking, nor was there any intimation contained therein, of their desire or intention to engage in such operation; and that by the act last aforesaid, the legislature intended only to grant the privileges, &c. requested in the petition, and to restrain and prohibit the association from engaging in any other operation, and particularly from those usually performed by incorporated banks. That under the act aforesaid, the *Utica Insurance Company* has been organized, by the subscription of stock, and the election of directors, and that the directors have appointed *James L. Kipp* to be president, and *Alexander B. *Johnson*, to be secretary of the said corporation. That the *attorney-general hoped* the *Utica Insurance Company* would have confined their operation to contracts of insurance against losses by fire, or otherwise, and to the business generally performed by insurance companies, and that they would not, in any way, have attempted to exceed the powers granted to them, and particularly, that they would not have engaged in issuing notes, receiving deposits, making discounts, or transacting any other business, which incorporated banks may of right do, &c. But now *so it is*, that the *said Utica Insurance Company*, combining, &c., have commenced the issuing of bank

1817.

Att. Gen'ral
v.
Utica Ins. Co.

† 2 *N. R. L.*
p. 234.

[ * 373 ]

1817.

ATT. GEN'RAL
v.
UTICA INS. CO.

notes to a large amount, the receiving of deposits, and the making of discounts, and, in general, all the other moneyed concerns usually performed by incorporated banks, claiming to have right to do so, by the provisions of the act of incorporation aforesaid; *whereas*, the attorney-general avers, that all such transactions are unauthorized by the said act, and are a direct violation of the act first above mentioned. That the said company have issued, and are issuing, large quantities of notes for the payment of money, which are industriously circulated, &c. *In consideration thereof*, and to *the end*, that the said company may make answer, under their common seal, and that they may be *enjoined* from issuing notes for the payment of money, from receiving deposits, from making discounts, and from all other transactions incident to incorporated banks, and that other relief may be afforded to the people, &c. Prayer for a subpœna, and for an injunction, as aforesaid, to continue until the further order of the Court.

*January 27th.* The *attorney-general* now moved for an injunction, agreeable to the prayer of the information.

*Harison*, and *T. A. Emmet*, contra.

[ *374 ]     *The *attorney-general* cited the following authorities:

1. As to the origin and authority of the Court: *Doct. & Stud.* ch. 8. p. 19. 1 *Fonbl. Eq.* 1. note *f.* p. 10.

2. As to the jurisdiction of the Court, where the remedy sought is for the prevention only, and not for the punishment of an offence. (1.) In a case of *forgery, Fitter* v. *Lord M.* 1 *Vern.* 292. *Franklin* v. *Hampden*, 1 *Vern.* 66. *Brownsword* v. *Edwards*, 2 *Ves.* 246. (2.) As to *nuisances*, *Coulson* v. *White*, 3 *Atk.* 21. *Anon.* 3 *Atk.* 750. S. C. *Ambler*, 158. *Attorney-General* v. *Richards*, 2 *Anst.* 603. *Same* v. *Foundling Hospital*, 4 *Bro. Ch. Cas.* 165. 1 *Fowl. Exc. Pr.* 293. *Mitford's Pl.* 17. *Attorney-General* v. *Nichol*, 16 *Vesey, jun.* 338.

3. That in England, the Court of Chancery, from its ordinary jurisdiction, is the proper forum, to try the rights of the subject in hostility to the rights of the crown, in cases, (1.) *Of an intrusion;* the *Queen* v. *Earl of Northumberland*, *Plowd.* 310. *Attorney-General* v. *Allgood, Park. Rep.* 1. (2.) *Of a patent; Attorney-General* v. *Vernon*, 1 *Vern. Rep.* 370. 4 *Co. Inst.* 79. 87. (3.) *Of petition and monstrans de droit;* 4 *Co. Inst.* 79. *Skinn. Rep.* 609. (4.) *Traverse of Office;* 4 *Inst.* 79. (5.) *Of franchises; Churchman* v. *Turnstie*, 1 *Hard.* 162.

That a *quo warranto* is a *civil* proceeding. 1 *Str.* 101. 8 *Mod.* 201. 2 *Term Rep.* 484.

That no indictment lies in this case, 6 *Bac. Abr.* 393. 9 *Johns. Rep.* 557.

As to the construction of the act incorporating the defendants, 6 *Bac. Ab.* statute (I.) 5 *Co. Litt.* 79. *a. Plowd.* 369. 1 *Atk.* 174. 2 *Term Rep.* 793.

As to the construction of the restraining act, 6 *Bac. Ab.* 391. 10 *Mod.* 282. *Prec. in Ch.* 215.

That corporations must act up to the object of their creation, and that this Court has the supervisory power of them, 1 *Bl. Com.* 479. 2 *Term Rep.* 204. *Cooper's Equ. Pl.* 103. note. 10 *Co.* 30. b. 1 *Sid.* 161. *Wm. Jones,* 168.

*For the defendants,* the following points were stated and authorities cited ; that this Court has no jurisdiction, there being adequate remedy at law, by an information in nature of a *quo warranto;* and that if it had jurisdiction, it would not execute it in the first instance, and before the legal right was settled at law. 2 *Cas. in Ch.* 165. 2 *Vesey,* 414. *Ambl.* 209. *Dick. Rep.* 599.

That there is no right of property in question ; and, being a violation of a statute, it was a *criminal* proceeding, with which this Court could not interfere. *Coop. Eq. Pl.* 141. 1 *Harris Ch. Pr.* 71. 2 *Vesey,* 398. 1 *Mad. Ch.* 104. 3 *Atk.* 750. *Ambl.* 138.

THE CHANCELLOR. An information is filed by the attorney-general, *ex officio,* against the defendants, charging them with engaging in banking operations, without any authority under the act incorporating them, and in violation of the prohibition in the act *to restrain unincorporated banking associations.* The information concludes not only with the usual prayer for process of *subpœna,* but for an injunction to restrain the company from the business incident to incorporated banks.

I thought it not proper to listen to the prayer in this case *ex parte,* but as Lord *Eldon* did, in the case of the *Attorney-General* v. *Cleaver,* (18 *Ves.* 217.) I directed notice of the motion to be given.

A motion is now made, in pursuance of notice, for an injunction, according to the prayer of the information. This motion is resisted on the part of the defendants on these two grounds :—

1. That this is not a case properly within the jurisdiction of this Court, and especially not proper for the application, in the first instance, of the writ of injunction.

*Margin notes:* 1817. ATT. GEN'RAL v. UTICA INS. CO. [ *375 ] January 29th.

1817.

ATT. GEN'RAL
v.
UTICA INS. Co.

[ * 376 ]

2. That the charge in the information, that the defendants have no authority to exercise banking powers, or that *they come within the prohibition of the restraining act, is not well founded.

I shall confine myself to the consideration of the first point, because, in the view in which I have considered it, I shall be obliged, on that objection, to dispose of the case.

The application for the injunction is not because it is intended to be merely auxiliary to a proceeding at law. The entire and final remedy is sought in this Court.

Whether the defendants have banking powers given them by the act by which they are incorporated, is, strictly, a legal question. It is equally a question of law, whether they were within the purview of the restraining act. I have always understood it to be a general principle, in respect to the powers of this Court, that when a cause depends, simply and entirely, on the solution of a dry legal question, the proper *forum* for the determination of that question is a Court of law. It appears not to admit of doubt, nor do I understand it to be disputed, that if the defendants, as a corporation, have assumed powers not within their charter, the people of this state, by their attorney-general, have a complete and adequate remedy at law, either by the common law writ of *quo warranto*, or by an *information*, in the nature of such writ. The act of the 6th of *February*, 1788, entitled, " an act for rendering the proceedings upon writs of *mandamus*, and informations in the nature of *quo warranto*, more speedy and effectual," declares, that if any persons shall usurp, or unlawfully hold and execute, any office or franchise within this state, it shall be lawful for the attorney-general, with the leave of the Supreme Court, to exhibit an information in the nature of a *quo warranto*, at the relation of any person, to be prosecuted in the Supreme Court, to try the right to such office or franchise, and the defendants may come in and plead. If found guilty of a usurpation, or unlawfully holding and executing any such office or franchise, the Supreme Court may give judgment of ouster,

[ * 377 ]

*and fine such persons for usurping or unlawfully holding and executing any such office or franchise.

Prosecutions at common law, or under the statute of 9 *Ann*, (of which this act is a copy,) have been very frequent in the K. B. against persons for assuming powers not within their charters of incorporation. Mr. *Kyd*, in his *Treatise on Corporations*, (vol. 2. 395—446.) has recollected numerous precedents of prosecutions, in this way, in the K. B., and it appears to be the established course.

The right of banking was
formerly a com-

The right of banking was, formerly, a common law right, belonging to individuals, and to be exercised at their pleasure.

292

But the legislature thought proper, by the restraining act of 1804, and which has been since re-enacted, to take away that right from all persons not specially authorized by law. Banking has now become a franchise derived from the grant of the legislature, and subsisting only in those who can produce the grant; if exercised by other persons, it is the usurpation of a privilege, for which a competent remedy can be had by the public prosecutor in the Supreme Court. I cannot find that this Court has any ordinary concurrent jurisdiction in the case.

The *quo warranto* at common law was a criminal proceeding; and in addition to the judgment of seizure, or of ouster, there was judgment that the defendants be taken to make fine to the king for the usurpation. The information in the nature of a *quo warranto*, under the statute, is, also, strictly a criminal proceeding, being for the usurpation of a state prerogative; and the statute authorizes a fine to be imposed, as well as to oust the party from his assumed franchise. It was held to be so far a criminal proceeding in the cases of *Rex* v. *Bennett*, (1 *Str.* 101.) and of *The King* v. *Jones*, (8 *Mod.* 201.) that the K. B. did not deem itself authorized even to award a new trial. But the fine not being of late years exacted, or being nominal only, it is now so far considered as a mere civil proceeding, that a new trial can be granted. (*King* v. *Francis* *2 *Term Rep.* 484.) But it will readily be perceived, that this power is not, of itself, a decisive test whether a proceeding be properly of a civil or criminal nature; for the power of awarding new trials is now exercised at law, in all cases of misdemeanors. (6 *Term Rep.* 638.)

The restraining act itself considers the business of banking, without legislative authority, as an *offence*, for which the party offending is subject to a penalty. It is, no doubt, a contempt of the statute; and if a particular penalty had not been imposed, or if that penalty had not been in the same prohibitory clause, but had been in a separate, substantive section, then it seems to be admitted, (*Rex* v. *Wright*, 1 *Burr.* 543. *Rex* v. *Robinson*, 2 *Burr.* 799. *King* v. *Harris*, 4 *Term Rep.* 202.) that the party might have been punished by indictment, as for a misdemeanor.

The charge contained in the information savors, then, so much of a criminal offence, that it would require a clear and settled practice, to justify the interference of this Court, when that interference is not called for, in aid of a prosecution at law. The charge of an usurpation of a franchise, has so frequently occurred, and the remedy, by injunction, is so convenient and summary, that the jurisdiction of this Court would have been placed beyond all possibility of doubt, and

mon law right, belonging to individuals; but since the restraining act of the legislature, it is a *franchise* derived from the legislature.

A *quo warranto* at common law was a criminal proceeding.

So, also, is an *information* in the nature of a *quo warranto*, under the statute.

[ *378 ]

**1817.**

ATT. GEN'RAL
v.
UTICA INS. Co.

This Court
has no jurisdic-
tion of an of-
fence against a
public statute,
or of *criminal*
matters.

[ * 379 ]

In what cases
an injunction
may properly
issue.

Carrying on
banking ope-
rations contrary
to the statute,

[ * 380 ]

's not such a

have been distinctly announced, by a series of precedents, if any such general jurisdiction existed.    But I have searched, in vain, for this authentic evidence of such a power.    The precedents are all in the Court of K. B., and *Kyd* cites nearly an hundred instances, within the last century, of informations filed in the K. B., to call in question the exercise of a franchise.

If a charge be of a criminal nature, or an offence against the public, and does not touch the enjoyment of property, it ought not to be brought within the direct jurisdiction of this Court, which was intended to deal only in matters of civil right, resting in equity, or where the remedy at law was not sufficiently adequate.    Nor ought the process of *injunction to be applied, but with the utmost caution.    It is the strong arm of the Court; and to render its operation benign and useful, it must be exercised with great discretion, and when necessity requires it.    Assuming the charges in the information to be true, it does not appear to me that the banking power, in this case, produces such imminent and great mischief to the community, as to call for this summary remedy.    The *English* Court of Chancery rarely uses this process, except where the right is first established at law, or the exigency of the case renders it indispensable.    Thus, in *Brown's* case, in 2 *Vesey*, 414. a motion was made for an injunction to stay the use of a market, and Lord *Hardwicke* said, it was a most extraordinary attempt, and that the plaintiff had several remedies which he might use.    He said it would cause great confusion, to bring into contempt, upon the injunction, all persons who might use the market; and that if the Court ought to interpose at all, it would be after the title was established at law.    So he observed in another case, (*Amb.* 209. *Anon.*) that the Court granted an injunction to stay the working of a colliery with great reluctance, and will not do it, except where there is a breach of an express covenant, or an uncontroverted mischief.    In a late case, before Lord *Eldon* (*Attorney-General* v. *Nichol*, 16 *Vesey*, 338.) on an information filed to restrain the defendant from obstructing the ancient lights of a hospital, he stated that the foundation of this jurisdiction, by injunction, was that head of mischief, or those mischievous consequences, which required a power to prevent as well as to remedy, and that there might be nuisances which would support an action, but which would not support an injunction.

If the defendants are carrying on banking operations, contrary to law, they ought, undoubtedly, to be restrained; but I cannot be of opinion that the operation is such a *mischief or public nuisance, as to require the immediate and extraordinary process of this Court to abate it.    I know

294

that the Court is in the practice of restraining private nuisances to property, and of quieting persons in the enjoyment of private right; but it is an extremely rare case, and may be considered, if it ever happened, as an anomaly, for a Court of equity to interfere at all, and much less preliminarily, by injunction, to put down a *public* nuisance which did not violate the rights of property, but only contravened the general policy.

There are no particular individuals affected or disturbed in the enjoyment of their private rights, by the banking power assumed in this case. There is no such allegation made. The case, then, has no analogy to that of *Baines* v. *Baker*, (*Amb.* 158. 3 *Atk.* 750.) on which some reliance has been placed, because Lord *Hardwicke* intimated, that the attorney-general, in the case of a public nuisance, could, in his discretion, file an information. In that case, a bill was filed by one individual against another, and a motion was made for an injunction to stay the building of a house to inoculate for the small-pox. The motion was founded as well on a special covenant in the lease, as on the annoyance of such an establishment to the neighborhood, and to the plaintiff's property. The chancellor said, that if that house was a nuisance at all, it was a public nuisance, because it diffused terror, and thereby affected many people; and then he said, if it was a public nuisance, it would be for the consideration of the attorney general, whether he would file an information. And where was it to be filed? Lord *Hardwicke* did not expressly say in what Court, though he referred to a case before Lord Ch. *King*, who had recommended an information for a public nuisance, in stopping a way, to be filed *in the* K. B. The inference then is, perhaps, as fair, that the chancellor meant that the information was to be filed in the K. B. as in this Court. Perhaps that is the stronger inference; *but be that as it may, can it be supposed that, on such a dubious *dictum*, uttered sixty years ago, I am to assume so great a power as a jurisdiction over public nuisances, which are, in truth, public misdemeanors? It is sufficient to state such a proposition, and there to leave it.

There is, however, one case on the equity side of the Court of Exchequer, which merits more attention. It is that of the *Attorney-General* v. *Richards*, (2 *Anst.* 603. 35 *Geo.* III.) in which an information was filed by the attorney-general for erecting docks and other buildings, to the injury of *Portsmouth* harbor; and the prayer was, that the defendant might be restrained from any other erections, and that those made might be abated. The defendant pleaded title. The injury charged was a public nuisance of a particular kind, termed *purpresture*, which means an encroach-

*margin:*

1817.

ATT. GEN'RAL
v.
UTICA INS. Co.

mischief, or public nuisance, that this Court would grant an injunction to restrain the party, even if it had jurisdiction over public nuisances, which, *it seems*, it has not.

[ * 381 ]

ment upon, and an inclosure of, the property of the *crown*, in a highway, river, or harbor.

This case was elaborately argued. It was contended, on the part of the king, that, in the case of such a nuisance, it was proper to proceed by information, which might be done in equity, as well as at law, and the nuisance might be decreed to be abated. The counsel cited the case of the *Attorney-General* v. *Philpot*, in the exchequer, the 8 *Car.* I., which was an information for encroaching on the soil of the crown, on the river *Thames*, and obstructing navigation. The Court, in the case cited, declared, that *purprestures* on navigable rivers ought to be abated, and directed a commission to inquire whether the fact complained of was a *purpresture*, and it being returned that it was, the encroachment was abated. The cases of the *City of Bristol* v. *Morgan*, and of the *Town of Newcastle* v. *Johnson*, were also cited from Lord *Hale's* treatise *De Portibus Marvis*, (p. 81.) in which bills to abate *purprestures* on navigable waters had been sustained in the exchequer.

[ * 382 ]

*The counsel on the part of the defendant contended, that as to the question of nuisance, it was a matter completely foreign to the jurisdiction of a Court of equity. It was a breach of the general police of the kingdom, and as such, was considered as a crime. That a Court of equity could not hold cognizance of any criminal matter. That it was never attempted to prosecute a suit in equity, to remedy any other public mischiefs, such as to prohibit rope-dancing, plays, &c., nor to abate a nuisance or *purpresture* on the highway. That those things were every day prosecuted in the ordinary criminal Courts. That questions of nuisance were particularly improper to be discussed in equity, because the remedy at law was complete. That the cases cited, in the time of *Charles* I., were when the right to trial by jury was not so firmly established as it was afterwards.

The Court of Exchequer held, that the crown, by its subjects, had possession of the place in question, and that the defendant had not showed title to the soil, and that under the authorities of the cases cited, in the time of *Charles* I., and the sanction given to them by Lord *Hale*, (see his treatise, *sup.* p. 87, 88.) in the case where a *purpresture* and nuisance had been committed on the king's soil, he might have a decree in that Court to abate it; and such a decree was accordingly awarded.

There are several observations that naturally arise upon this case. It was to redress a particular species of nuisance, consisting in an encroachment on the king's soil; and the cases cited were all of the same nature, and all in the Court

of Exchequer, which had, originally, an appropriate jurisdiction, touching the property of the crown.   It shows, that the equity jurisdiction, in cases of public nuisance, even of that description, and in that Court, had lain dormant for a century and a half, or from the time of *Charles* I., when the precedents which governed the Court arose, down to the year 1795.   The nuisance, as charged *in that case, was not only a serious and dangerous one, for it affected such an important harbor as *Portsmouth*, but the crown established a right of *property* in the soil, and it was a question of injury to property, like the case of a private nuisance.   Speaking of this case, Baron *Wood* says, (1 *Wightwick*, 212.) that " save in this case of nuisance and purpresture, and in the case of prerogative mills, I hold that the king's attorney-general has no right to file his bill on the equity side of the exchequer, but for matters of equity.

But giving to this case the utmost weight, there is very little analogy between it and the one now before me.   Here is no encroachment on the property of the state,. nor is the mischief of a similar nature.   The objection to the exercise of the banking power in this case is, that it is unlawful, and not warranted by law.   It would be quite extravagant to hold it to be a public nuisance, or that kind of annoyance and mischief which a nuisance implies.   The information is founded on the charge, that the banking power exercised by the defendants is not given by their charter, and that it is an offence against the statute.   There is no case in which an information has been sustained in this Court, on such grounds.   In the case of *The Attorney-General* v. *Cleaver*, (18 *Vesey*, 211.) an information was filed in chancery to restrain a public nuisance, and the case of *Baines* v. *Baker*, and the case in the exchequer, were cited in support of the jurisdiction of the Court.   But the lord chancellor doubted as to the jurisdiction, and did not recollect any case, in his experience, except that of *The Mayor and Corporation of London* v. *Bolt*, (5 *Vesey*, 129.) which was a private suit by bill; and he thought that the interposition of this Court was, at least, very confined and rare, and that the fact of the nuisance ought first to be ascertained by a jury.

*There is a class òf cases which I may notice, in which the *English* Court of Chancery has exercised a control over corporations, in respect to breaches of trust; and even here the application of the jurisdiction has been confined to charitable institutions.   In *The Attorney-General* v. *The Foundling Hospital*, (4 *Bro.* 165.   2 *Vesey, jun.* 42.) Lord Com. *Eyre* said, he had no doubt the Court had a jurisdiction over charitable corporations, and that when the trustees of them abused their trust, the Court would take notice of such abuse.

1817.

ATT. GEN'RAL
v.
UTICA INS. CO.

[ * 383 ]

[ * 384 ]
Whether this Court has jurisdiction or control over corporations in respect to breaches of trust, unless in the case of a *charitable* institution?

1817.

ATT. GEN'RAL
v.
UTICA INS. Co.

But in the case of *The King* v. *Watson*, (2 *Term Rep.* 199.) the Court of K. B. seemed to go further, and to think, that if any corporation misapplied moneys, it was an abuse of trust, which might be the ground of application to chancery. The chancery cases do not recognize any such general jurisdiction. In the *Attorney-General* v. *Corporation of Carmarthen*, (*Cooper's Eq. Rep.* 30.) it was denied, in the very case of a misapplication of funds. In *Adley* v. *The Whitstable Company*, (17 *Vesey*, 315.) Lord *Eldon*, hesitatingly, admitted a jurisdiction in equity against a corporation, in favor of a member, as well as a stranger, by ordering an account of the profits, when he was excluded from a share in the profits of the company by an illegal by-law. There was, in that case, a necessity for the jurisdiction, for there was no mode of ascertaining what was due to the plaintiff, except an account in a Court of equity ; and yet he said, it was with great reluctance that the Court would interfere, if the party had a complete remedy at law. In the case of *The Mayor and Commonalty of Colchester* v. *Lowten*, (1 *Ves. & Beame*, 226.) which was a bill to set aside a mortgage of corporate property, as unduly made by an officer of the corporation, under the corporate seal, for purposes not corporate, the lord chancellor held, that there was no instance of a *trust* attaching upon the ground of misapplication of funds by corporations, except in the case of corporations *holding to charitable uses. He evidently did not concur in the *dictum* (for it was nothing more) of the Court of K. B. in the *King* v. *Watson*, and did not think there was ever a case in which the doctrine of trust was applied, so as to give chancery jurisdiction over a case of a mere alienation of property to purposes not corporate, unless it was a case of a charitable trust.

[ * 385 ]

But be this point (and which is still left open by these cases) determined either way, there is no charge of a breach of trust as the ground of this information. It does not appear, in the present case, that any more than the surplus funds of the company are appropriated to banking, or that the moneys so applied are not beneficially employed for the interest of the company. It is probable the members of the corporation deem it the best employment of their surplus capital. The charge of a breach of trust ought to come from, or on behalf of, the *cestui que trusts*, or stockholders of the company. If they are satisfied, no other person is entitled to complain. If they approve of the act of their trustees in instituting banking operations, there is no ground for any allegation of a breach of trust. That charge is not the foundation of the present suit. The information is not at the instance, or upon the relation of, the stockholders, and, consequently, these authorities have no application

The information, as I have already observed, is in the nature of a public prosecution, instituted in behalf of the state, for the violation of a public law, and the usurpation of a franchise. The whole corporation, trustees and *cestui que trusts*, are equally involved in the accusation.

But there is still another ground, with another class of cases, urged in support of the jurisdiction of this Court, and this is the power of visitation, and superintending the conduct of corporations, and which is said to be vested in the Court of Chancery.

*It will be necessary to examine some of the cases, in order to define the nature and extent of this power.

It was laid down by Sir *Wm. Blackstone*, in his *Commentaries*, (vol. 1. 481.) as a settled elementary proposition, that the king was, by law, the visitor of all civil corporations, and that the place where he exercised that jurisdiction was in the Court of K. B., where, and where only, all misbehaviors of civil corporations were inquired into and redressed. I do not cite this respectable opinion as equivalent to a judicial authority. It is pretty good evidence, however, of the received understanding of the law at that day, though the point has been since much discussed, whether the visitatorial power over civil corporations devolved personally on the king, or belonged to the K. B. by virtue of its general superintending authority.

In the case of *Rex* v. *Bishop of Chester*, (2 *Str.* 797.) the K. B. held, that where there was no other visitatorial power in being, it *resulted* to the K. B., and they issued a *mandamus* to the bishop, as warden of *Manchester* college, to admit a chaplain. This case was, afterwards, cited by Lord *Hardwicke*, in 1 *Vesey*, 471, as good law; and it was also relied on by Lord *Mansfield*, in the case of *Rex* v. *Gregory*, (12 *Geo.* III. 4 *Term Rep.* 240. note.) In this last case there was a rule to show cause why an information, in nature of a *quo warranto*, should not be filed against the defendant, to show by what authority he claimed to be fellow of *Trinity Hall*, in *Cambridge*. Lord *Mansfield* observed, that "as to the first objection to this mode of application, that the K. B. could not interfere, because if there be no visitor, the power of visitation escheated to the king, in chancery, as a charity, he answered, that the foundation there was not a charity, and that the power of visitation did not go to the king as visitor. That it was a corporation, and as such, the right devolved to the king to be exercised there in the K. B."

*So the law stood on this point, until the case of *The King* v. *Master and Fellows of St. Catharine's Hall, Cambridge*, (4 *Term Rep.* 233.) came before the K. B. in 1791.

299

1817.

Att. Gen'ral
v.
Utica Ins. Co.

[ * 386 ]

Whether this Court has a *visitatorial* power, or superintending jurisdiction over corporations, civil, eleemosynary, or charitable?

[ * 387 ]

1817.

ATT. GEN'RAL
v.
UTICA INS. Co.

A rule was granted for the defendants to show cause why a *mandamus* should not issue to them, to declare the fellowship of the Rev. Mr. *Wood* vacant, and proceed to the election of another fellow.

*Erskine* and *Law* showed cause, and contended, that the right of visitation, in default of heirs of the founder, devolved on the king, who visited, by his chancellor, or by special commissioners under the great seal; which latter mode was adopted in *Eden* v. *Foster*, in 2 *P. Wms.* 315. They further contended, that where the king was founder of an eleemosynary or charitable corporation, or where a private person endows, and appoints no visitor, the king visits, by his chancellor. That the power of visitation was personal in its nature, to be exercised by the founder, or by the king, in his personal capacity. That the very foundation of the visitatorial power was a *general discretion*, which was repugnant to the constitution of the K. B., which was governed by established rules of law.

*Bearcroft* and *Le Blanc*, on the other side, held, that where the king was visitor, in right of a royal foundation, the power was to be exercised through the medium of his chancellor, and not by the K. B. That where there was no visitor the remedy was in the K. B., and that it arose from the general superintending authority which that Court exercised over all corporations. *That there was no instance of interference by the Court of Chancery where there was no visitor.*

The Court of K. B. decided, that in the case of a private eleemosynary corporation, where there was no special visitor, the right of visitation devolved upon the king, to be exercised by his chancellor, under the great seal, and they refused to interfere. Lord *Kenyon*, in giving the opinion of the Court, said, that corporate bodies, which *respected the public police of the country, and the administration of justice, were better regulated under the superintendence of the K. B., but that it was otherwise with eleemosynary foundations in general.

It is to be observed, that this was the case of an eleemosynary, or charitable corporation; and this is the amount of the authority on the point. The cases have no manner of application to the one before me; and if they had, I should think that the decision in *Strange*, and the opinion of Lord *Mansfield*, were of equal weight with the case I have last cited; and they give the right of visitation, where there is no special visitor even of charitable institutions, to the K. B. But the *Utica Insurance Company* cannot be termed a charity, in the sense of the law. It is a civil corporation, for private pecuniary purposes; though, at the same time,

[ * 388 ]

300

deemed to be connected with the public good, like other insurance companies, or, like banking, manufacturing, and numerous other civil corporations in this state. Nor do I think that this case falls within the meaning, or object, of the power of visitation, of which the books treat so largely. That power, it seems, rests entirely on general discretion ; and so it was expressly declared by the counsel for the defendants, in the case just cited. In respect to charitable institutions, the chancellor exercises this power of visitation, as the personal representative of the crown. It appertains to the person who holds the great seal, rather than to the Court of Chancery, as a *Court* of equity jurisdiction. (*Ex parte Dann*, 9 *Vesey*, 547.) It may be exercised by a commission issued under the great seal. If it was not a power residing in the individual who happens to hold the great seal, but was a power in the Court of Chancery, as a proper and established branch of equity power, there is no reason why this right of visitation should not be equally exercised by the Court of Exchequer. But this has never been done, and I doubt much whether the visitatorial power exists at all, and in *any case, in this Court, in the *English* sense of that power, as a right emanating from the royal prerogative, and founded on discretion. I should rather conclude, that, under the constitutional administration of justice in this state, all corporations, of whatever name or description, were amenable to the Supreme Court, and to that Court only, according to the course of the common law, for nonuser, or misuser, of their franchises. But, at the same time, I admit, that the persons who, from time to time, exercise the corporate powers, may, in their character of trustees, be accountable to this Court for a fraudulent breach of trust ; and to this plain and ordinary head of equity, the jurisdiction of this Court over corporations ought to be confined. Thus, for instance, if the directors of the *Utica Insurance Company* were to appropriate the funds, or capital, of the company to their own private emolument ; or if, disregarding the business of insurance, they were to divert the funds to the destruction of that object, by making roads and canals, or building theatres, or churches, I have no doubt this Court would have a right, and would be bound, to interfere and check the abuse. But when the question is, whether a corporation has forfeited its charter, or has usurped a franchise, or has broken a penal law, the case is widely different: this Court is not the proper tribunal to sustain the prosecution, or to inflict the punishment. In the case of *The Attorney-General* v. *The Earl of Clarendon*, (17 *Vesey*, 491.) the master of the rolls said, that chancery had no jurisdiction with regard either to the election, or the amotion, of corporators

1817.

ATT. GEN'RAL
v.
UTICA INS. CO.

[ * 389 ]

of any description. Eleemosynary corporations were the subject of visitatorial jurisdiction, and it is by petition to the great seal, and not by bill or information. But he admitted that corporations, constituted trustees, had sometimes been, by decrees of the Court, devested of their trust for an abuse of it, as any other trustees would have been.

I have thus examined every source from which the *power, now claimed for this Court, was to be deduced; and I cannot find any sufficient warrant for this proceeding. The exercise of the banking power cannot be brought under the head of a public nuisance. It has none of the characteristic marks of a mischief which calls for such a remedy as injunction. It may be endured without excessive public annoyance, until it can be abated by the regular process of the common law. Even if it was a nuisance, I should not deem myself sufficiently authorized to abate it, on the strength of one solitary modern case in the exchequer, by no means analogous. It is well understood, that public nuisances are public offences, over which the Courts of law have had a uniform and undisputed cognizance. Nor does the case, as charged, amount to a breach of trust, of which I am to take notice. There is no complaint, on the part of the stockholders, of misconduct, nor is the information founded on any thing of that kind. If there had been a prosecution instituted for a breach of trust, it would have been by bill, and against individuals by name, calling them to account for the use and benefit of the company at large. This information proceeds against the whole corporation, in its corporate capacity, for a mere usurpation of power belonging to the government alone, or to its special grantees. Nor can the jurisdiction of this Court be deduced from the visitatorial power, which the chancellor, in *England*, exercises, as keeper of the great seal, and as the king's personal representative over charitable institutions.

The plain state of the case, then, is, that an information is here filed by the attorney-general, to redress and restrain, by injunction, the usurpation of a franchise, which, if true, amounts to a breach of law, and of public policy. I may venture to say, that such a prosecution is without precedent in this Court, but it is supported by a thousand precedents in the Courts of law. How, then, can I hesitate on the question of jurisdiction?

*The whole question, upon the merits, is one of law, and not of equity. The charge is too much of the nature of a misdemeanor to belong to this Court. The process of injunction is too peremptory and powerful in its effects to be used in such a case as this, without the clearest sanction. I shall better consult the stability and utility of the powers

302

of this Court, by not stretching them beyond the limits pre-
scribed by the precedents.

Without, therefore, giving any opinion on the question,
whether the *Utica Insurance Company* are entitled to exer-
cise banking powers, I am of opinion, that I have no juris-
diction in the case before me, and that the motion for the
injunction must be denied.

Motion denied.