[LOCAL LAW.]

## M·CONNELL *against* THE TRUSTEES OF THE TOWN OF LEXINGTON.

A question in equity as to the title to a lot of land in the town of Lexington, Kentucky, reserved as public property, and claimed as having been appropriated by the plaintiff's ancestor. Bill dismissed under the circumstances of the case.

*Feb.* 12*th.*

This cause was argued by Mr. *Rowan* for the plaintiff, and by Mr. *Talbot* for the defendant.

*Feb.* 22*d.*

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This suit was brought in the Court of the United States for the Seventh Circuit and District of Kentucky, against the trustees of the town of Lexington, and others, to obtain a conveyance of *in and out lots*, No. 43, in that town, or of such other lots in lieu of them as might still remain to be conveyed, by the trustees. The whole of *out lot* No. 43, and a part of the *in lot*, had been conveyed to other persons who had been in possession for such a length of time as to bar the plaintiff's action. The bill was, therefore, dismissed by the plaintiff as against those defendants, and continued against the trustees.

The commonwealth of Virginia had, in 1773, by an act commonly called "the land law," reserved 640 acres of land for the benefit of those who had settled in a village or station, that it might be afterwards laid out into lots for a town, and divided among such settlers. The inhabitants of Lexington purchased 70 acres adjoining the reserve of 640 acres, and after laying the whole off in lots and streets, petitioned the assembly to establish a town. The legislature, in May, 1782, passed an act, vesting the whole 710 acres in trustees, who were empowered to make conveyances to those persons who had already settled on the said lots, as also to the purchasers of lots theretofore sold ; and to lay off

such other parts of the said land as was not then laid off and settled into lots and streets, and to sell, or otherwise dispose of the same, for the benefit of the inhabitants.

James M'Connell was one of the settlers in Lexington, and was killed by the Indians in 1782. His brother and heir at law, Alexander M'Connell, filed this bill in 1815, and founds his claim on proof that he had in his lifetime erected a tannery on *in lot* No. 43, on which was a large spring; and on the following order of the board of trustees:

"At a meeting of the board of trustees for the town of Lexington, September 30th, 1782, No. 43 in and out lot granted to James M'Connell, to be appraised, and the valuation thereof redound to the heirs of said M'Connell, deceased."

The trustees, in their answer, insist that *in lot* No. 43 never was granted to James M'Connell, but a part of it has always been considered as reserved, on account of a spring upon it, for the use of the inhabitants. They are informed by the old settlers that the privilege of establishing a tannery on that lot was in the year 1781 granted to James M'Connell, who did establish one, and that the order of appraisement was intended to cause a valuation of the improvements and of the leather in the tannery, not of the lot itself; and that so much of the entry as applies to the lot itself is a mistake of the clerk. They say that other lots, not these, were granted to M'Connell. They also insist on the length of time which has elapsed, and on the statute of limitations.

Several certificates from the clerk, and extracts from the record books of the trustees, are filed as exhibits in the cause. From one of these certificates it appears, that, on the 20th of December, 1781, at the first arrangement of *in and out lots* of the town of Lexington, among the settlers, *in lot* No. 18, and *out lot* No. 37, were granted to James M'Connell as his donation lots. The *out lot* appears to have been transferred by John Clarke, whose connexion with M'Connell is not stated, to Robert Parker, to whose assignee a conveyance was made by the trustees in August, 1785.

An assignment by Alexander M'Connell, as heir at law of James, of his title to an *out lot* in the town of Lexington, made in May, 1795, is produced: but this assignment neither

1827.

M‘Connell
v.
The Town of
Lexington.

mentions the number of the lot, nor the name of the assignee.

Another certificate from the clerk states, that *in lot* No. 18. was granted on the 26th of March, 1781, to William Stule, and afterward, on the 20th of December, 1781, to Benjamin Hayden. It was afterwards, on the 1st of July, 1783, awarded to James M‘Connell, and afterwards, on the 8th of March, 1785, was forfeited. The cause of forfeiture is not mentioned. The presumption is, that it must have been on account of the non-performance of some condition on which the allotment was made.

The entries of the orders made by the trustees seem to be in great confusion. This may be well accounted for by the then situation of that country. Some time in the year 1784, or 1785, Robert Parker, then clerk of the board of trustees, was ordered to transcribe their old books. Many of their entries were made on small scraps of paper, and on backs of old letters. The book then made out is said to be lost. There is, however, a book of records.

The imperfect and confused state of the books has made it necessary to resort to the testimony of witnesses to supply facts which the books do not disclose.

It is very well ascertained, that the large spring, below which M‘Connell's tan vats were sunk, was enclosed within the stockade, and was used by the inhabitants of the fort generally. It is also in proof that the settlers were each entitled to an *in and out lot*, and that the trustees frequently allowed those who were dissatisfied with the lots which they drew, to exchange them for others not previously granted.

William Stule, who was one of the original trustees, deposes, that the lot on which the tan vats were sunk in spring, 1782, was called *M‘Connell's lot*, but he does not recollect any contract between M‘Connell and the trustees, or any disposition made by them of the lot; until a part of it was given to Bradford, on which to erect a printing office.

Robert Patterson was also one of the original trustees, and was friend and relation of M‘Connell. He deposes that M‘Connell was a tanner; the trustees being desirous to attract tradesmen to the station, permitted M‘Connell to erect a tan yard on the lot in contest about the fall, 1781. That the deponent was authorized by the trustees about the year

1783 or 1784, to clear out and wall up the public spring, for which he was paid by them. That it was called and used as the public spring from the first settlement of the town. He believes M'Connell was permitted to use part of the lot as a tannery for the people of the town, because it was more convenient, and under cover of the fort. While thus used, it was called M'Connell's tan yard. He does not know that the trustees intended to make any other grant of the lot than to suffer its use by M'Connell. They fixed a market house on the lot in 1790 or 1791, and then claimed it as their own property. They granted part of it in the year 1787 to John Bradford, on condition of his establishing a printing office on it, reserving the public spring and a considerable front on Main and Water streets, on which they erected buildings which were rented to Bradford. They reserved a number of lots for public use.

John Torrence. William Martin, Samuel Martin, Benjamin Hayden, Joseph Mitchell, Josiah Collins, and Hugh Thompson, were among the early settlers of Lexington, and were examined, some of them by the appellant, and some by the trustees. They all concur in the declarations, that the spring was public, for the use of the people of the fort generally; that it was called the public spring; some that it was called the public spring lot; that M'Connell sunk vats, and constructed a tan yard on it, after which it was called M'Connell's tan yard, and one witness is inclined to think M'Connell's lot. They all concur, however, in denying having ever heard that the lot was given to M'Connell, or to any other person. Some say, though they never heard him claim the lot, they have heard him claim the tan yard. Joseph Mitchell swears that M'Connell claimed a lot in a different square. Hugh Thomson says, that the records of the trustees, which are produced to him at the time his deposition is taken; plainly show that *in lot* No. 18, and *out lot* No. 38, were granted to James M'Connell. John Parker, and Alexander Parker, came to Lexington, the one in 1783, and the other in 1784. They were each of them members of the board of trustees, and depose to the universal understanding that the spring lot was reserved for public use, and had never been granted to any person, until a part of it was granted to

*[margin note:]* 1827. M'Connell v. The Town of Lexington.

Bradford for a printing office.   Alexander Parker says, that on looking into the record books, while a trustee, he saw, with surprise, the entry under which Alexander M'Connell claims ; and on making inquiries from Col. Robert Patterson, also a trustee, was informed that the trustees had prevailed on James M'Connell to establish a tannery under cover of the fort, to tan buffaloe hides, and had, after his death, appointed appraisers to value his property.  That the entry appears in its present form, is the mistake of the clerk who made it.  He adds, that the records show, that *in lot* No. 18, and *out lot* No. 38, were granted to James M'Connell.

The entry under which the appellant claims lot No. 43, does not purport to grant him that lot, but directs a valuation in terms which import a former grant.  No trace of that former grant is, however, found, and the testimony is very strong to prove it was never made.   The reasonableness of reserving a public spring for public use ; the concurrent opinion of all the settlers that it was so reserved ;  the universal admission of all, that it was never understood that the spring lot was drawn by any person ; the early appropriation of it to public purposes ; the fact that James M'Connell actually claimed a different lot, added to the length of time which has been permitted to elapse without any assertion of title to this lot, are, we think, decisive against the appellant. There was no error in dismissing the plaintiff's bill, and the decree is affirmed, with costs.