Court of Common Pleas of Galia County.

CITY OF GALLIPOLIS *v.* MARY E. MILLS.
CITY OF GALLIPOLIS *v.* NAMAN R. CANADY.
CITY OF GALLIPOLIS *v.* JEANETTE HEALEY.
CITY OF GALLIPOLIS *v.* MARY GARLINGTON.

Decided May 6, 1929.

WHITCRAFT, J.

In each of the above cases the plaintiff alleges its corporate capacity and avers that it has a legal estate in, and is entitled to the possession of certain real estate described

in the petition. The prayer is for judgment for the possession thereof.

In each answer the defendant, after admitting the corporate capacity of plaintiff, denies generally the allegations of the plaintiff and by way of cross petition asserts ownership in fee in the premises and prays that the title thereto be quieted as against the city of Gallipolis.

The replies of the plaintiff are identical in their language and each denies that defendant is in possession of the premises described in the petition and avers that said defendant is not seized in fee of said lands.

The issues thus made up were submitted to the court, a jury having been waived by the parties.

Each of the defendants is the owner of lots or parcels of land bounding and abutting on the northeasterly side of Front Street (now First Avenue) of the city of Gallipolis, and each claims to own in fee simple a tract of equal width or frontage in front of and extending from the northeasterly side of First Avenue to low water mark of the Ohio river, subject to the easement of the public for travel thereover, and subject also the easement of the public for the purpose of navigation in that part between the top of the bank of the river and low water mark.

Some of the premises involved in these cases are a part of the town of Gallipolis as originally laid out and are bounded on the one side by the southeasterly tier of lots of said town and on the other by low water mark of the Ohio river.

The original plat of the town (Plaintiff's Exhibit 1) discloses that all the long streets, including what is now First Avenue, run north 47 degrees east and are 66 feet and 10 inches in width except Front street, which is — feet. The last named street is the first one from the Ohio river, and between it and the river twenty eight lots or parcels of land were laid out of varying widths and depts and were denominated "garden lots." These so called "garden lots" were laid out along the southeasterly side of Front street up the river to a point the length of one lot above Pine street. From this point the course of the river is changed perceptibly to the northwest, and should Front street have continued northeasterly to the extreme limits

of the town, as originally laid out, and the southeasterly line thereof been extended in the same general direction, that is to say, north 47 degrees east, there would have been little, if any, land between the southeasterly line of Front street and the top of the bank of the river.

However, no such line is shown on the plat, but from a point immediately northeast of Lots Nos. 361 and 362 and "garden lot" No. 28 Front street leads into an open or blank space bounded by a tier of lots on the northwesterly side and the river on the southeasterly side. This particular space is not marked or designated on the plat other than the name "Front street" appears some four blocks southeasterly therefrom.

We learn from the evidence and statements of counsel that as early as 1805 a public road was laid out by the county commissioners of Gallia county from the county jail to Reese's Landing opposite Point Pleasant and distant about four miles up the river. This highway is now State Route No. 7, and so long as the oldest citizen can remember the traveled portion thereof has been in substantially the same place on the blank space indicated on the plat above mentioned. The public has used it for the purpose of travel so long "that the memory of man runneth not to the contrary;" and it may be reasonably presumed that for almost a century and a quarter the public has continuously used this so called blank space, or so much thereof as was reasonably necessary for the purpose of travel thereover. No lots were laid out on the river side and no use was made so far as the testimony discloses of any part of this tract except for street or highway purposes until within the last twenty-five years.

The flood of 1884 made a substantial change in the course of the river at this point. It cut into the bank, and, at some points, near the traveled portion of the street or highway; and the owners of property immediately northeasterly therefrom, evidently became alarmed and fearful of the in-roads that might be made by subsequent floods, naving a desire to protect their premises from further advances of the river, caused several thousand willows to be planted at the foot of the almost perpendicular bank with a veiw of arresting the threatened injury.

to their property by the water. From the foot of the bank to the low water mark, in 1884 and for some years thereafter, there was nothing but sand and gravel which was subject to frequent overflows and of no value for any purpose.

The testimony discloses that the growth of the willows caused such a change in the flow of the water as to form an eddy, and, with the rise of the water, deposits of silt and alluvium were made from time to time, so that there is now from twelve to sixteen feet of new soil of great fertility which the defendants and their predecessors in title have used for gardening purposes for from eighteen to twenty-seven years.

None of the lands in question have ever been entered upon the tax duplicate for taxation, but a building or shack was maintained for a time by the defendant Canady on the premises claimed by him and upon which he paid taxes at a valuation of $100.00.

The determination of the rights of the parties in these cases, so far as the several tracts of land located within the limits of the original town of Gallipolis is concerned, depends upon whether there was a dedication to public use of the so-called blank or undesignated space appearing upon Exhibit 1, and an acceptance thereof by the public.

What is required to constitute a dedication either at common law or by statute and the acceptance thereof by the public is too well settled to require the citation of authorities at length.

It may be stated as a general rule that to constitute a valid dedication there must be an intention on the part of the owner to devote his property to the public use, and this intention must be clearly and unequivocally manifested; but the intention which the courts give heed to is not an intention hidden in the mind of the land owner, but an intention manifested by his acts. 13 Cyc. 452 and cases cited; *Fulton* v. *Mahrenfeld*, 8 O. S., 440; *Wright* v. *Oberlin*, 3 C. C. (N. S.) 242.

No formal acceptance was required by the public, nor is it always necessary that it be accepted by the city council, or other public authorities; but it may be accepted by the general public. 13 Cyc., 465.

And the general public accepts by entering upon the land and enjoying the privileges offered; in other words by user.

It is significant that the proprietors in laying out the town of Gallipolis clearly expressed an intention to withhold from the public the strip of land between the southeasterly side of Front street and the top of the river bank where it was of sufficient width to be of any practical purpose or appreciable value and divided it into "garden lots." A strong presumption, therefore, follows that where there was little or no land between the street line continued in the same direction to the town limits and the top of the but, on the contrary, was dedicated to public use. Morebank of the river, it was not withheld for private purposes, over, the lots were sold with reference to this blank or undesignated space; the public has used it, or so much thereof as was necessary for travel and other street purposes for more than a century without interruption; and there being no evidence that the proprietors or their successors in interest have at any time ever asserted any title thereto, it would appear that there can be little doubt as to the intention of the owners to dedicate this strip to public use and its acceptance by the inhabitants of the town of Gallipolis.

We are not, however, left to conjecture in determining the questions involved here, for the Supreme Court of the United States and many other courts of last resort have been called upon to meet like situations.

The pioneer case is that of *Barclay et al* v. *Howell's Lessee*, decided by the Supreme Court of the United States and reported in 6 Pets. 498. The action was for ejectment. The premises in controversy was a lot or parcel of land lying between Water street and the river Monongahela, in the city of Pittburgh.

Plaintiff in error claimed for the city of Pittsburg that this slip of land lying on the bank of the river Monongahela, near the junction of that river with the Allegheny, being a space between the south line of the lots of the city of Pittsburg ond the Monogahela river. It was contended by the city that this slip of land was dedicated by

the surveyor when he laid out the town, to the public as a street or for other public purposes.

It appears that there was vested in the Penn family a tract of land consisting of between five and six thousand acres that included the city of Pittsburgh, which at that time was only a village of a small number of setlers, very few, if any, who had any title to the lots they occupied. This tract was denominated a "manor," as was the practice at that time to call large tracts of land, which had been surveyed within the charter of the original proprietor of Pennsylvania. Being desirous of laying out a town at Pittsburg, the Penns directed a surveyor to survey a part of the manor, lay out lots and streets and make a plat thereo, which was done. Water street and the premies in controversy in the ejectment suit were included in this survey. Mr. Justice McLean, in the opinion, observed that:

"From the plan of the town it does not appear that any artificial boundary as to the southern limit of Water street was laid down. The name of the street is given and its northern boundary; but the space to the south is left open to the river. All the streets leading south terminated in Water street; and no indication is given in the plat or in any plat of the return of the surveyor that Water street did not extend to the river as it appears to do by the face of the plat."

The court held:

"That there was a dedication to the public of the premises from the southern limit of the lots to the river's edge at low water mark; and in the opinion the learned judge said: 'There is nothnig, however, on the plat which shows any limits to the width of Water street short of the river on the south. If a line had been drawn along its southern limit there would have been great force to the argument that the ground between such limit and the water was reserved by the proprietors. This would have been the legal consequences from such a survey unless the contrary had been shown.' "

In the instant cases it should have been stated that if the southeasterly line of Front street had been continued to the town limits, leaving a strip of land between it and

the river, the rule laid down by our own Supreme Court in *McLaughlin* v. *Stevens*, 18 O., page 94, would apply.

The doctrine laid down in *Barclay et al* v. *Howell's Lessee, supra,* was reaffirmed in the very interesting and instructive opinion of Mr. Justice Thompson in the case of *Cincinnati* v. *White,* decided by the Supreme Court of the United States and reported in 6 Pets., page 431. It might be well to note that such eminent counsel as Storer, Webster, Ewing and Clay appeared. The case involved title to a strip of land in Cincinnati abutting upon the Ohio River and usually denominated as "the commons." It was held:

"That the right of the public to use 'the commons' in Cincinnati must rest on the same principle as the right to use the streets; and that the dedication made when the town was laid out gave a valid and indefeasible title to the city of Cincinnati."

It was further held:

"That no particular form or ceremony is necessary in the dedication of land to public use. All that is required is the consent of the owner of the land and the fact of its being used for the public purposes intended by the appropriation."

The rule was followed and the same principle applied by the Supreme Court of the United States in *New Orleans* v. *United States,* 10 Pets. 662, and *McConnell* v. *Lexington,* 12 Wheat. 582.

In the case last cited above the opinion was written by Chief Justice John Marshall.

It is only necessary to refer to one other case upon this subject. In *Parish* v. *Stephen,* decided by the Supreme Court of Oregon, and reported in 1 Or., page 62, we have a case with the facts very similar to the ones under consideration here. The proprietors of the town of Portland caused a plat to be made exhibiting blocks of lots designated by number with blank spaces between them, which coalesced with each other at their intersections and with the surrounding blank spaces at the sides of the plat. Near the first row of the lots the Willamette river is laid down at such a distance as to leave a narrow strip between, which, owing to the meanderings of the river, is of var-

-iable width, being in some places narrower and in others wider than the blank spaces between the rows of lots. In this case there was no evidence on the face of the plat that the spaces were intended for streets except that they formd a connected net work of open spaces among and in front of the blocks, making all the lots accessible from each other and from the river which is at this point an arm of the sea. Upon this strip of land between the river and the first row of lots obstructions were erected, and it was claimed by the proprietors that the street in front did not cover the entire strip, but left a narrow margin along the bank not dedicated to the public and on which they sold lots and erected buildings. Their right to do so was contested by the citizens who claimed the entire strip as public ground. In the opinion delivered by Olney, J., and which shows an exhaustive examination of the authorities, the contention of the public was sustained, the proprietors were enjoined and the city authorized to remove the obstructions.

I am clearly of the opinion, therefore, that the blank space appearing upon Plaintiff's Exhibit No. 1 was dedicated to public use by the proprietors of the town of Gallipolis and that the evidence clearly discloses an acceptance thereof on the part of the public.

It is equally well settled that the public would take title to the newly formed land or accretions thereto.

In the case of *New Orleans* v. *United tSates, supra,* the Supreme Court held:

"The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations still holds the same boundary including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory, and, as he is also without remedy for his loss, in this way he can not be held accountable for his gain. The rule is no less just when applied to public than to private rights."

As to all of the premises in controversy which are situate within the limits of the town of Gallipolis as originally laid out, the finding and judgment will be for the plain-

tiff and the cross petitions of the defendants will be dismissed.

The quit claim deed from the Ohio Company to Fearing and Meigs, as trustees for the inhabitants of the town of Gallipolis, executed in 1819 and introduced at the trial, is persuasive evidence of an intention to reliquish any private right in this strip of land in favor of the public use.

As to that part of the premises involved in the above cases which is situated in Section 29 and outside the limits of Gallipolis, as originally laid out, more difficulty is encountered.

Neither the city nor defendants claim to have any record title to such premises, nor has plaintiff shown any dedication of the same to public use other than that included within the limits of the street or highway; nor has any occupation by the city of any more of said premises been shown. As to that part which is southeasterly of First avenue, no title or right of possession is shown by plaintiff and, therefore, the city must fail as to that part of said premises. The descriptions set out in the petition with the aid of the evidence do not afford sufficient information to enable the court to go further than to say that as to the parcel of land situated in Section 29, southeasterly of First avenue, the city has shown no right of possession and must fail in its action.

Coming now to the issues made up by the cross petitions and replies thereto, so far as the same relate to the premises situated in Section 29 the defendants have likewise failed to make out their case as I conceive the law upon the admitted or proven fact.

These premises were not entered by the present owners, or their predecessors in title under a deed or grant defining the boundaries of the lands they claim and in controversy in these actions, nor is any record title claimed. Moreover, only a part of the premises was actually tilled, and this part was the high ground made by the river. It has only been in existence for a few years comparatively speaking, and was used solely for gardening. Mrs. Healey set some posts close to the line of the street after the 1913 flood, and later made requests of the municipal authorities

to take steps to prevent further erosion. She complained when they neglected or refused so to do.

I am, therefore, of the opinion that the defendants did not enter under *color of title*, and the rule announced in *Humphreys* v. *Huffman*, 33 Ohio St., 395, applies. It is there held:

"Where the entry is without color of title, or upon a paper title, which is void for want of a descr.ption of any land, this presumption does not attach (constructive possession), and the adverse possession only extends to that part of the land actually occupied and improved."

Manifestly, none of the defendants actually occupied more of the lands they respectively claimed than was used for gardening purposes, which was a part only of the tracts described in their cross petitions, that is, the elevated part of the newly made land. This is not definitely described in the cross petitions, nor does the evidence afford sufficient information to enable the court to make a decree quieting their alleged title. The cross petitions will, therefore, be dismissed.